# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK
## CENTRAL ISLIP

| | |
|---|---|
| ANDREW BELLOMO, individually and on behalf of all others similarly situated, | 2:24-cv-03480 |
| Plaintiff, | |
| - against - | Class Action Complaint |
| BIG LOTS INC., | |
| Defendant | Jury Trial Demanded |

Andrew Bellomo ("Plaintiff"), through Counsel, alleges upon information and belief, except for allegations about Plaintiff, which are based on personal knowledge:

1. A coral consists of small, plankton-eating invertebrates called polyps.

 

2. Though mistaken for inanimate rocks or plants, corals are animals.

3. Unlike plants which make their own food, corals use tiny tentacle-like

arms to capture food and consume it through their mouths.

4.    The soft-bodied polyps have an outer limestone, or calcium carbonate skeleton, for protection.

5.    What most people understand as "coral reefs" begin as free-swimming coral larvae that have attached to underwater rocks or hard surfaces.

6.    Like all living things which thrive in specific geographic areas, traditional coral reefs flourish in shallow waters.

7.    This is because the algae that sustains them requires sunlight that is best absorbed when close to the ocean surface.

8.    Since the algae necessary for coral to thrive requires stable, warm temperatures, corals are generally found in tropical regions.

9.    Coral reefs expand only centimeters per year, taking thousands of years to develop.

10.    Coral is a building block of reef ecosystems which, though occupying less than 0.1% of oceans, provide homes for a quarter of all marine life.

11.    The excess sugar produced by algae is transformed into a slimy mucus-like substance, which is consumed by bacteria and other smaller microbes.

12.    This attracts larger sea creatures like crabs, shrimp, snails, and worms, which are also seeking food.

13.    Finally, fish and other larger marine species, like turtles, show up,

creating an endless loop where nutrients are recycled, and the ecosystem thrives.

 



14.    While the coral benefits from the abundance of marine activity, it also

provides shelter for fish where they can reproduce and hide from predators.

 

15.    While most people associate coral reefs with bright colors and tropical

3

climates, close to the ocean surface, these ecosystems are found deep in cooler waters, in temperate regions.



16.   This includes off the coast of New York.

17.   Instead of subsisting on algae, these adaptive lifeforms obtain energy through organisms passing through the deepest parts of the sea.

18.   These reefs contain not only coral, but seaweed, bivalve mollusks, plants, and worms.

19.   The waters off New York are home to coral reefs, such as the *Astrangea poculata*, "a temperate encrusting stony coral."[1]

---

[1] https://reefs.com/coral-diversity-in-new-york/



20.   Whether in tropical or temperate regions, coral reefs are natural resources that protect the nearby land coast while providing a habitat for marine life.

21.   Unfortunately, coral reefs have been placed in peril by a variety of manmade threats and have declined by roughly half since 1950.

22.   The result is that previously teeming ecosystems have disappeared, as luminescent and vibrant coral reefs become barren, due to external causes such as excess nutrients like nitrogen and phosphorus, global warming, overfishing and absorption of chemicals.



23.    Within the past several years, researchers determined that chemicals in sunscreen are a significant factor in their decline.

24.    This was confirmed by studies in journals, such as Archives of Environmental Contamination and Toxicology, which initially concluded two common ultraviolet filters in sunscreen, oxybenzone and octinoxate, were causing immense harm to coral reefs.

25.    Laboratory tests established that when baby coral were exposed to oxybenzone and octinoxate, they experienced "coral bleaching," shown by the white polyps below.



26.    The loss of their symbiotic algae causes coral to turn white, rendering them more susceptible to disease and death.

27.    Moreover, bleached corals means the habitat of fish and other marine life is degraded, rendering their survival and reproduction more difficult.

28.    The damage caused by chemicals in sunscreens washing off swimmers and harming coral reefs has been documented by the non-profit Haereticus Environmental Laboratory ("HEL"), the National Park Service ("NPS") and scientists across the globe.

29.    These groups recommend that beachgoers use sunscreen formulated to be safe for coral reefs and ocean life.

30.    This typically means avoiding chemical sunscreens which rely on synthetic compounds to absorb ultraviolet ("UV") rays from the sun.

31.    Seeking to capitalize on growing consumer awareness of the harm

caused to these "rainforests of the sea," and/or appreciation of the physical environment, Big Lots Inc. ("Defendant") manufactures and/or markets sunscreen labeled as "Reef Conscious," next to a graphic of a reef, with "conscious" understood consistent with its common usage with respect to environmental issues, and dictionary definitions, as "especially aware of or worried about something," under its Sound Body brand ("Product").



32.    Just as "environmentally conscious" describes "a state of mind and a way of life that is focused around protecting and safeguarding the natural world," "reef-

conscious" is similarly understood by purchasers with respect to "protecting and safeguarding" reefs.

33.   Should eagle eyed purchasers discern what appears to be a smudge of ink next to "Reef Conscious" in the form of a mysterious dagger symbol, they are not told what it means or where to look.

34.   Only purchasers who turn the container around, and then wade through a wall of fine print, reading to the very bottom, will discover this dagger † symbol means the "Formula is compliant with HI SB2571."



35.   While SB2571, which amended Hawaii's Water Pollution Law, by prohibiting the "Sale and distribution of sunscreen containing oxybenzone or octinoxate," was based on the earliest studies of reef ecosystems, more recent

investigations have concluded that other ingredients, such as "avobenzone, homosalate, octocrylene, [and] octisalate," pose an equivalent or greater threat. Haw. Rev. Stat. § 342D-21.

36.   For instance, the common sunscreen ingredient of octocrylene was recently found to be a precursor to benzophenone, a carcinogenic chemical that is "bad for fish, corals, and other invertebrates."

37.   That sunscreen ingredients beyond oxybenzone or octinoxate are not consistent with being "Reef Conscious" was confirmed by the Reef Safe Sunscreen Buying Guide from leading snorkeling website, Snorkel Around The World, which noted that "Dangerous ingredients" imperiling reefs include avobenzone, octoclyrene, octisalate, and homosalate.[2]



---

[2] Best Reef Safe Sunscreen.

38.    Beyond the halls of the state house in Honolulu, regular Hawaiians know legislative efforts did not go far enough, imploring swimmers to "SAVE OUR REEFS," by "Avoid[ing] Using [Sunscreens]" that not only contain "OXIBENZONE [and] OCTINOXATE," but also "AVOBENZONE, HOMOSALATE, OCTOCRYLENE, OCTISALATE [AND OTHER] TOXIC INGREDIENTS."



39. Unfortunately for purchasers seeking sunscreen that is "Reef Conscious," the usage of which would be consistent with protecting and safeguarding reef ecosystems, the Product includes the decidedly "[not] Reef Conscious" chemicals of "Avobenzone (2.0%), Homosalate (7.0%), [and] Octocrylene (5.0%)," identified on the back of the bottle in small print, comprising fourteen percent of its contents, as its potent, especially to reefs, "Active

ingredients."



40.   Moreover, its fifteen other ingredients, listed further towards the bottom, "alcohol denat., isododecane, diisopropyl adipate, acrylates/octylacrylamide copolymer, VA/butyl maleate/isobornyl acrylate copolymer, PEG-12 dimethicone, caprylyl glycol, hydrogenated methyl abietate, ascorbyl palmitate, tocopheryl acetate, mineral oil, panthenol, water, aloe barbadensis leaf extract, fragrance," are accurately designated as "Inactive (ingredients)" with respect to their role in the sunscreen, they are not "Inactive" with respect to being linked to detrimental effects on reef ecosystems and the environment.

41.   Nowhere on the front or back of the Product are purchasers told what Snorkel Around The World and Hawaiians know, that sunscreen containing ingredients known and/or linked to harming critical and fragile reef ecosystems and/or the environment, is not "Reef Conscious."

42.   Purchasers of sunscreen lack the expertise of renowned dermatologist Dr. Henry W. Lim, of the Henry Ford Medical Center in Detroit, that "[t]he definition of what the manufacturer might mean by 'reef safe' and similar terms [like 'reef conscious'] keeps broadening."

43.   Another expert described terms, including "Reef Conscious," as "really just a sales gimmick at the moment."

44.   To protect the public against such "sales gimmicks," the Pure Food and Drug Act of 1906 established a baseline of truthfulness for over-the-counter ("OTC") drug products sold at the local drug store.

45.   These requirements of "honesty and fair dealing" were strengthened by the Federal Food, Drug, and Cosmetic Act ("FFDCA"). 21 U.S.C. § 301 *et seq*.; 21 C.F.R. Parts 200 and 300.

46.   As the scale of deception in consumer products increased beyond descriptions of efficacy, to environmental attributes, the Federal Trade Commission ("FTC") established its "Green Guides" to rein in deceptive environmental marketing claims. 16 C.F.R. Part 260 ("Guides for the Use of Environmental

Marketing Claims").

47.   New York adopted these federal requirements to protect its environment and ensure its citizens could make informed decisions about what they were buying, through its Education Law ("EDN"), Environmental Conservation Law ("ECL"), and administrative guidance, such as Procurement Guidelines. *See* EDN, Title 8, Article 137 – Pharmacy, § 6800 *et seq.*; EDN § 6802(13) (requiring compliance with identical federal statutes and regulations); Title 8, New York Codes, Rules, and Regulations ("NYCRR") § 29.7(a)(16) ("Special provisions for the professions of pharmacy and registered pharmacy technicians"); ECL § 1-0101(2)-(3) (describing "the policy of the state…in cooperation with the federal government," to include "Guaranteeing that the widest range of beneficial uses of the environment is attained without risk to health or safety, unnecessary degradation or other undesirable or unintended consequences").

48.   The FDA, FTC, and this State's legislative and administrative bodies, knew that "consumers initially [] rely on extrinsic cues such as visual information on labels and packaging," and these rules were designed to create an honest marketplace.[3]

---

[3] Lancelot Miltgen et al., "Communicating Sensory Attributes and Innovation through Food Product Labeling," Journal of Food Products Marketing, 22.2 (2016): 219-239; Helena Blackmore et al., "A Taste of Things to Come: The Effect of Extrinsic and Intrinsic Cues on Perceived Properties of Beer Mediated by

49.   The description of the Product as "Reef Conscious," next to a graphic of a reef, is "false or misleading," because its active and inactive ingredients, including avobenzone, homosalate, octocrylene, and/or octylacrylamide copolymer, do not "protect and safeguard" reef ecosystems and/or the environment, because they are harmful to them, causing it to be "misbranded."[4] EDN § 6815(2)(a); 21 U.S.C. § 352(a)(1) (defining "misbranded" where an OTC product's "labeling is false or misleading in any particular.").

50.   The Product's description as "Reef Conscious," next to a graphic of a reef, "overstat[es], directly or by implication, [its] environmental attribute[s] or benefit[s]," related to its impact on fragile and critical reef ecosystems and/or the environment, such that purchasers expect its use will "protect and safeguard" both, even though its active and inactive ingredients, including avobenzone, homosalate, octocrylene, and/or octylacrylamide copolymer, are linked to harm and/or cause harm, to reefs and/or the environment. 16 C.F.R. § 260.3(c).

51.   The Product's "unqualified" description as "Reef Conscious," next to a graphic of a reef, "convey[s] that [it] has specific and far-reaching environmental benefits…[and]   no   negative   environmental   impact,"   by   "protecting   and

_____

Expectations," Food Quality and Preference, 94 (2021): 104326; Okamoto and Ippeita, "Extrinsic Information Influences Taste and Flavor Perception: A Review from Psychological and Neuroimaging Perspectives," Seminars in Cell & Developmental Biology, 24.3, Academic Press, 2013.

[4] "Misbranded" is a statutory term of the era, used to denote the capacity to mislead.

safeguarding" fragile and critical reef ecosystems and/or the environment, even though its active and inactive ingredients, including avobenzone, homosalate, octocrylene, and/or octylacrylamide copolymer, are linked to harm and/or cause harm to them. 16 C.F.R. § 260.4(b).

52.  Nowhere on the labeling does the Product tell purchasers that its active and inactive ingredients, including avobenzone, homosalate, octocrylene, and/or octylacrylamide copolymer, do not "protect and safeguard" reef ecosystems and/or the environment, and are not "Reef Conscious," promoted next to a graphic of a reef, because they are linked to harm and/or cause harm to them.

53.  As a result of the false and misleading representations, the Product is sold at a premium price, approximately no less than $3.79 for 5.5 oz (156 g), excluding tax and sales, higher than similar products, represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

## JURISDICTION

54.  Plaintiff is a citizen of New York.

55.  Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

56.  The aggregate amount in controversy exceeds $5 million, including any statutory or punitive damages, exclusive of interest and costs.

57.   Defendant is an Ohio corporation with a principal place of business in Ohio.

58.   The class of persons Plaintiff seeks to represent includes persons who are citizens of a different state from which Defendant is a citizen.

59.   The members of the proposed class Plaintiff seeks to represent are more than one hundred, because the Product has been sold at sixty-four Big Lots stores within the State and online to citizens of this State.

60.   The Court has jurisdiction over Defendant because it transacts business within New York and sells the Product to consumers within New York from its sixty-four stores in this State and/or online, to citizens of this State.

61.   Defendant transacts business in New York, through the sale of the Product to citizens of New York from its sixty-four in this State and/or online, to citizens of this State.

62.   Defendant has committed tortious acts within this State through the distribution and sale of the Product, which is misleading to consumers in this State.

63.   Defendant has committed tortious acts outside this State by labeling, representing and selling the Product in a manner which causes injury to consumers within this State by misleading them as to its contents, quantity, attributes, type, origins, amount, and/or quality, by regularly doing or soliciting business, or engaging in other persistent courses of conduct to sell the Product to consumers in

this State, and/or derives substantial revenue from the sale of the Product in this State.

64.   Defendant has committed tortious acts outside this State by labeling the Product in a manner which causes injury to consumers within this State by misleading them as to its contents, quantity, attributes, type, origins, amount, and/or quality, through causing the Product to be distributed throughout this State, such that it expects or should reasonably expect such acts to have consequences in this State and derives substantial revenue from interstate or international commerce.

## VENUE

65.   Plaintiff resides in Nassau County.

66.   Venue is in this Court because a substantial or entire part of the events or omissions giving rise to Plaintiff's claims occurred in Nassau County.

67.   Venue is in this Court because Plaintiff's residence is in Nassau County.

68.   Plaintiff purchased, used, consumed, and/or applied the Product in reliance on the packaging, labeling, representations, and omissions, identified here, in Nassau County.

69.   Plaintiff first became aware the packaging, labeling, representations, and omissions, were false and misleading, in Nassau County.

## PARTIES

70.   Plaintiff Andrew Bellomo is a citizen of Nassau County, New York.

71.   Defendant Big Lots Food Markets Inc. is a New York corporation with a principal place of business in New York.

72.   Big Lots operates over 1,400 stores in 47 states, with sixty-four in New York.

73.   Big Lots combines discount retailing with warehouse-style quantities, allowing customers to maximize their value.

74.   The range of products sold at Big Lots includes food, furniture, seasonal items, electronics, home decor, OTC products, toys, and gifts.

75.   While Big Lots leading national brands, it sells many products under one of its private label brands, Sound Body.

76.   Private label products are made by third-party manufacturers and sold under the name of the retailer, or its sub-brands.

77.   Previously referred to as "generic" or "store brand," private label products have increased in quality, and often are superior to their national brand counterparts.

78.   Products under the Sound Body brand have an industry-wide reputation for quality.

79.   In releasing products under the Sound Body brand, Big Lots' foremost criteria is high-quality, equal to or better than the national brands.

80.   Big Lots gets national brands to produce its private label items due its

loyal customer base and high standards.

81.   Private label products under the Sound Body brand benefit by their association with consumers' appreciation for the Big Lots brand overall.

82.   That Sound Body products met this high bar was or would be proven by focus groups, rating them above their name brand equivalent.

83.   A survey by The Nielsen Co. "found nearly three out of four American consumers believe store brands [like Sound Body] are good alternatives to national brands, and more than sixty percent consider them to be just as good."

84.   Private label products generate higher profits for retailers like Big Lots, because national brands spend significantly more on marketing, contributing to their higher prices.

85.   The result is that private label products can be sold at relatively lower costs compared to national brands.

86.   The development of private label items is a growth area for Big Lots, as they select only top suppliers to develop and produce Sound Body products.

87.   Plaintiff, like many consumers, seeks to purchase products which do not cause or are likely to cause harm to the environment, including reefs, relative to themselves and/or other similar products.

88.   Plaintiff and consumers understood "Reef Conscious," next to a graphic of a reef, consistent with common usage and dictionary definitions, as "especially

aware of or worried about something," which was harm to critical and fragile reef ecosystems and/or the environment, and that using the Product would be consistent with "protecting and safeguarding" them, expecting (1) the sunscreen would not cause harm to reefs and/or the environment, and/or (2) its use was generally better for reefs and/or the environment than products not so advertised.

89.   Plaintiff read and relied on the front label, which described it as "Reef Conscious," next to a graphic of a reef.

90.   Plaintiff relied on the omissions which failed to tell him that its use would not be consistent with "protecting and safeguarding" critical and fragile reef ecosystems and/or the environment, because it was harmful to them.

91.   Plaintiff was not aware that the Product's active and inactive ingredients did not protect and safeguard reefs and/or the environment, but were linked to harm and/or cause harm, to reefs and/or the environment.

92.   Plaintiff sought to purchase sunscreen that would protect and safeguard reefs and/or the environment, and/or was not, or was less detrimental, to reefs and/or the environment, than other similar products not so marketed.

93.   Plaintiff purchased the Product between April 2021 and April 2024, at Big Lots locations in New York, and/or other areas.

94.   Plaintiff bought the Product at or exceeding the above-referenced price.

95.   Plaintiff paid more for the Product than he would have had he known it

was not "Reef Conscious," promoted next to a graphic of a reef, and/or did not

"protect and safeguard" critical and fragile reef ecosystems and/or the environment,

because it was detrimental to them, as he would not have bought it or would have

paid less.

96.   The Product was worth less than what Plaintiff paid, and he would not

have paid as much absent Defendant's false and misleading statements and

omissions.

97.   Plaintiff chose between Defendant's Product and products represented

similarly, but which did not misrepresent their attributes, features, and/or

components.

## CLASS ALLEGATIONS

98.   Plaintiff seeks to represent the following class:

> All persons in New York who purchased the
> Product in New York during the statutes of
> limitations for each cause of action alleged,
> expecting it to be "Reef Conscious," and that
> it was not linked to harm to reefs and the
> environment and/or did not cause harm to
> reefs and/or the environment.

99.   Excluded from the Class are (a) Defendant, Defendant's board members,

executive-level officers, and attorneys, and immediate family members of any of the

foregoing persons, (b) governmental entities, (c) the Court, the Court's immediate

family, and Court staff and (d) any person that timely and properly excludes himself

or herself from the Class.

100. Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

101. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

102. Plaintiff is an adequate representative because his interests do not conflict with other members.

103. No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

104. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

105. The class is sufficiently numerous, with over 100 members, because the Product has been sold throughout the State for several years with the representations, omissions, packaging, and labeling identified here, at Defendant's sixty-four in New York and online, to citizens of this State.

106. Plaintiff's Counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequate and fairly.

**CAUSES OF ACTION**

## COUNT I
## General Business Law ("GBL") §§ 349 and 350

107. Plaintiff incorporates by reference paragraphs 1-53.[5]

108. The purpose of the GBL is to protect consumers against unfair and deceptive practices.

109. This includes making state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection.

110. The GBL considers false advertising, unfair acts, and deceptive practices in the conduct of any trade or commerce to be unlawful.

111. Violations of the GBL can be based on other laws and standards related to consumer deception.

112. Violations of the GBL can be based on the principles of the Federal Trade Commission Act ("FTC Act") and FTC decisions with respect to those principles. 15 U.S.C. § 45 *et seq.*

113. A GBL violation can occur whenever any rules promulgated pursuant to the FTC Act, 15 U.S.C. § 41 *et seq.*, are violated.

114. A GBL violation can occur whenever the standards of unfairness and deception set forth and interpreted by the FTC or the federal courts relating to the FTC Act are violated.

---

[5] To the extent any incorporation by reference is required.

115. A GBL violation can occur whenever any law, statute, rule, regulation, or ordinance which proscribes unfair, deceptive, or unconscionable acts or practices is violated.

116. In considering whether advertising is misleading in a material respect, the FTC Act recognizes that the effect of advertising includes not just representations made or suggested by words and images, "but also the extent to which [it] fails to reveal facts material in the light of such representations." 15 U.S.C. § 55(a)(1).

117. In considering whether the label and/or packaging of OTC products is misleading, it is required to consider not only representations made or suggested by statements, images, and/or design, but also the extent to which this fails to prominently and conspicuously reveal facts relative to (1) the proportions or absence of certain ingredients, and/or (2) other facts concerning its attributes and characteristics, such as ingredients, quantity, size, amount, origin, type, and/or quality, which are of material interest to consumers. EDN § 6802(13).

118. Defendant's false and deceptive representations and omissions with respect to the Product's contents, attributes, features, origins, amount, quantity, ingredients, and/or quality, that it would not cause harm to fragile and critical reef ecosystems and/or not cause environmental harm, are material in that they are likely to influence consumer purchasing decisions.

119. This is because consumers prefer to buy products made of ingredients

which are not linked to harm and/or cause harm to ecosystems like reefs and/or the environment, instead of having those ingredients replaced with others that cause such detrimental effects.

120. The replacement of ingredients which protect and safeguard ecosystems like reefs and/or the environment, with ingredients which do not protect and safeguard them, is of material interest to consumers, because (1) they prefer OTC products which not only protect and safeguard them, but whose usage "protects and safeguards" critical and fragile reef ecosystems and the environment, and is certainly not harmful to them or linked to causing harm to them, (2) the former ingredients cost more than the latter, (3) they seek to avoid more harmful ingredients, whether in the context of applying such products to their bodies or the ecosystems and environment impacted by their application of such products to their bodies, and/or (4) they seek products which tout their environmental bona fides, such as how they "protect and safeguard" and/or are  "conscious" of critical and fragile reef ecosystems and the environment, for reasons related to health, environmental harm, and/or quality.

121. The Product could have included ingredients which "protected and safeguarded" critical and fragile reef ecosystems and/or the environment, but added ingredients which are known to have detrimental effects on them, because they cost less and/or substituted for ingredients which would "protect and safeguard" them.

122. The labeling of the Product violated the FTC Act and thereby violated the GBL because the representations, omissions, packaging, and labeling, "Reef Conscious," next to a graphic of a reef, created the erroneous impression it consisted of ingredients that would "protect and safeguard" critical and fragile ecosystems like reefs and/or the environment, when this was false, because it contained ingredients which are known to have detrimental effects on them.

123. The labeling of the Product violates laws, statutes, rules and regulations which proscribe unfair, deceptive, immoral, and/or unconscionable acts or practices, intended to protect the public, thereby violating the GBL.

124. Violations of the GBL can be based on public policy, established by norms, customs, statutes, law, or regulations.

125. The labeling of the Product violated the GBL because the representations, omissions, labeling, and packaging, "Reef Conscious," next to a graphic of a reef, was unfair and deceptive to consumers.

126. The labeling of the Product violated the GBL because the representations, omissions, packaging, and labeling, "Reef Conscious," next to a graphic of a reef, was contrary to the GBL, EDN, and ECL, which adopted, where applicable, other laws and regulations.

| Federal | State |
|---------|-------|
| 21 U.S.C. § 352(a)(1) | EDN § 6815(2)(a) |
| | ECL § 1-0101(2)-(3) |
| | 8 N.Y.C.R.R. § 29.7(a)(16) |
| 16 C.F.R. § 260.3(c) | |
| 16 C.F.R. § 260.4(b) | |

127. Plaintiff believed the Product would "protect and safeguard" critical and fragile reef ecosystems and/or the environment, because the label said "Reef Conscious," next to a graphic of a reef.

128. Plaintiff paid more for the Product and would not have paid as much if he knew that it was not "Reef Conscious," because its usage did not "protect and safeguard" critical and fragile reef ecosystems and/or the environment, because it contained ingredients linked to harm to them and/or known to have detrimental effects on them.

129. Plaintiff seeks to recover for economic injury, financial damages, and/or economic loss he sustained based on the misleading labeling and packaging of the Product, a deceptive practice under the GBL.

130. Plaintiff will produce evidence showing how he and consumers paid more than they would have paid for the Product, relying on Defendant's representations, omissions, packaging, and labeling, using statistical and economic analyses, hedonic regression, hedonic pricing, conjoint analysis, and other advanced

methodologies.

131. As a result of Defendant's misrepresentations and omissions, Plaintiff was injured and suffered economic and financial damages by payment of a price premium for the Product, which is the difference between what he paid based on its labeling, packaging, representations, statements, omissions, and/or marketing, and how much it would have been sold for without the misleading labeling, packaging, representations, statements, omissions, and/or marketing identified here.

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1.  Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as Counsel for the class;

2.  Awarding monetary damages and interest;

3.  Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

4.  Other and further relief as the Court deems just and proper.

Dated:   May 12, 2024

Respectfully submitted,

/s/  Spencer Sheehan
Sheehan & Associates P.C.
60 Cuttermill Rd Ste 412
Great Neck NY 11021
Tel  (516) 268-7080

Fax (516) 234-7800
spencer@spencersheehan.com

*Notice of Lead Counsel Designation:*

*Lead Counsel for Plaintiff*

Spencer Sheehan

Sheehan & Associates P.C.

*Counsel for Plaintiff*

**Certificate of Service**

I certify that on May 12, 2024, I served and/or transmitted the foregoing by the method below to the persons or entities indicated, at their last known address of record (blank where not applicable).

|  | Electronic Filing | First-Class Mail | Email | Fax |
|---|---|---|---|---|
| Defendant's Counsel | ☐ | ☐ | ☐ | ☐ |
| Plaintiff's Counsel | ☒ | ☐ | ☐ | ☐ |
| Court | ☒ | ☐ | ☐ | ☐ |

/s/ Spencer Sheehan